# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WEST RUN STUDENT HOUSING ASSOCIATES, LLC; CAMPUS VIEW JMU, LLC; and MT. TABOR VILLAGE, LLC, | ) ) ) ) | |
| Plaintiffs, | ) | 2: 12-cv-00076 |
| v. | ) ) | |
| HUNTINGTON NATIONAL BANK, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Before the Court for disposition is the MOTION TO DISMISS AND MOTION TO STRIKE with brief in support, filed by Defendant Huntington National Bank (Document Nos. 11 and 12), the BRIEF IN OPPOSITION filed by Plaintiffs, West Run Student Housing Associates, LLC; Campus View JMU, LLC; and Mt. Tabor Village, LLC (Document No. 13), and the REPLY BRIEF filed by Defendant (Document No. 14). The Motion is now fully briefed and ripe for disposition.

### Factual Background

As the law requires, at this stage of the proceeding all disputed facts and inferences are to be resolved in favor of Plaintiffs, the non-moving party.

The claims asserted arise from three separate commercial real estate development projects for student housing: one at West Virginia University (the "West Run project"), one at Virginia Tech University (the "Mt. Tabor project"), and one at James Mason University (the "Campus View project"). Four individuals were the sponsors of each of the student housing projects.

1

A.    The West Run Project

In Spring of 2006, the sponsors formed West Run Student Housing Associates, LLC, ("West Run") to explore the possibility of developing a student housing project in Morgantown, WV. The project was a 994 bed facility, comprising 322 two, three, and four-bedroom apartments located in seventeen (17) three and four-story buildings, in addition to a clubhouse. West Run retained CBRE/Melody, a real estate broker, for the purpose of securing bank financing for the project. CBRE/Melody provided prospective lenders with proprietary information in conjunction with its efforts to secure bank financing. In September of 2006, West Run selected Sky Bank to provide financing for the project.

Sky Bank agreed to loan West Run $39.975 million, which financing closed on October 5, 2006. As of July 1, 2007, Huntington National Bank ("Huntington") became the successor-in-interest to Sky Bank's rights and obligations under the West Run loan transaction by virtue of its merger with Sky Bank.

Repayment of the loan was to be in two phases, the "Construction Phase," followed by the "Permanent Phase." In the Construction Phase, Sky Bank would be making advances to cover the construction costs and West Run was required only to make payments of the accrued interest on the amount borrowed. The Construction Phase was to terminate on November 30, 2009. Then, during the Permanent Phase, which started on December 1, 2009, West Run was required to make payments of both accrued interest and principal.

The West Run project was to be constructed in two primary phases. The first phase, consisting of the construction of the buildings which would house approximately half of the total number of beds, along with the clubhouse, was to be completed by summer of 2007, in time for the apartments to be rented for the 2007-2008 school year. The second phase, consisting of most

of the remaining half of the beds, was to be constructed by August 2008, with the full balance of the project to be completed by October of 2008. Phase I was completed on schedule in August of 2007 and construction of Phase II was completed in August of 2008.

In the fall of 2008, as the West Run project was being completed, construction commenced on an unrelated student housing project known as Copper Beech Townhomes ("Copper Beech"), which was located "literally across the street from [the West Run project]." By the spring of 2009, a number of the Copper Beech units were completed and were on the market, officially competing with the West Run project "for the same pool of potential student tenants." According to the Complaint, it was at this time that Plaintiffs first learned that "Huntingdon had participated, to the extent of $20 million, in the financing of Copper Beech."

The West Run project's overall occupancy dropped to under 64% in the fall of 2009, which decreased West Run's available cash flow. West Run anticipated, as of the spring 2009, that it would be unable to make the principal and interest payments due to Huntington as of December 1, 2009. West Run contends that its "occupancy crisis was caused by Huntington's financing of Copper Beech, with its resulting diminishment of [West Run project's] revenues."

### B. The Mt. Tabor Project

The Mt. Tabor project had many of the same individual sponsors as the West Run project. However, this project differed from the West Run project as it was smaller, consisting of only 38 units which were condominiums to be purchased rather than leased. The sponsors formed Mt. Tabor Village, LLC (the "Village") in order to facilitate the construction and management of the housing project. Huntington financed this condominium development by way of a $6 million loan which closed on December 26, 2007. The Construction Loan Agreement

3

required that the Village have in hand twenty-nine (29) Qualified Sale Agreements for condominium units before Huntington was required to fully fund the loan. *See* Construction Loan Agreement, Exh. 4 at 15. In the spring of 2009, as the project was nearing completion, Huntingdon refused the last construction advance - "the one that would have allowed the project to be completed." Amended Complaint at ¶ 50.

### C. The Campus View Project

Concurrently, with the Mt. Tabor project the same sponsors developed a third project, Campus View Student Condominiums ("Campus View") to be located in Harrisonburg, Virginia. The sponsors formed Campus View JMU, LLC ("JMU") to facilitate the construction and management of the housing project. Huntington agreed to extend financing for the Campus View project in the form of a $10.5 million secured revolving line of credit, which was secured by a mortgage on the property. The financing closed on February 22, 2008 and construction commenced at approximately the same time. The Construction Loan Agreement required JMU to secure a total of fifty-four (54) Qualified Sale Agreements before Huntington was required to fully fund the second phase of the Campus View project. In or around August of 2009, Huntington refused to extend further construction advances to JMU.

**Procedural Background**

Plaintiffs initiated this litigation on or about December 22, 2011, by the filing of a three-count Verified Complaint in the Court of Common Pleas of Allegheny County, Pennsylvania. Plaintiff West View generally alleged that Huntington breached its duty of good faith and fair dealing by its "participation in the loan to Copper Beech," which caused the failure of the West

4

Run project. Complaint, at ¶ 93. Both Mt. Tabor Village and Campus View each alleged breach of contract on the basis that Huntington failed to honor certain construction draws under the respective construction loan agreements.

On January 20, 2012, Huntington removed the lawsuit from Allegheny County to this Court. On January 27, 2012, Huntington filed a Motion to Dismiss all claims in which it argued that West Run's claims should be dismissed for failure to state a plausible claim and that the claims of Mt. Tabor Village and Campus View should be dismissed on the basis that their own admissions established that they had not fulfilled certain unit pre-sales requirements, which relieved Huntington from any further funding obligations. *See* Complaint at ¶¶ 45, 54, 69, 71.

Apprised of possible shortcomings in their Complaint, Plaintiffs did not contest Huntington's motion to dismiss, but rather filed an Amended Complaint. Interestingly, the Amended Complaint omitted the factual allegations contained in the original Complaint which essentially stated that Mt. Tabor Village and Campus View had not fulfilled their unit pre-sales requirements.

Defendant filed a Motion to Dismiss the Amended Complaint again arguing that West Run's claims should be dismissed for failure to state a plausible claim. As to the claims of Mt. Tabor Village and Campus View, Defendant argues that these claims should be dismissed based on "their own admissions as to the pre-sales deficiencies" contained in the original Complaint.

Plaintiffs respond that West Run's claims as pled clearly meet the *Twombly* plausibility standard and that Defendant's request to dismiss the claims of Mt. Tabor Village and Campus View "based on allegations found in the original complaint, which are absent from the amended complaint, is untenable." Br. in Opp'n, at 9.

5

## Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiently of the complaint filed by plaintiff. The United States Supreme Court has held that "[a] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alterations in original).

The Court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. However, as the Supreme Court made clear in *Twombly*, the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* The United States Supreme Court has subsequently broadened the scope of this requirement, stating that only a complaint that states a plausible claim for relief survives a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Thus, after *Iqbal,* a district court must conduct a two-part analysis when presented with a motion to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the Court must separate the factual and legal elements of the claim. *Id.* Although the Court "must accept all of the complaint's well-pleaded facts as true, [it] may disregard any legal conclusions." *Id*. at 210-11. Second, the Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Id*. at 211 (*citing Iqbal* 129 S. Ct. at 1949). The determination for "plausibility" will be "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. at 211 (*quoting Iqbal* 129 S. Ct. at 1950).

As a result, "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Id*. at 211. That is, "all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible. This then 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. at 210 (*quoting Iqbal,* 129 S. Ct. at 1948).

However, nothing in *Twombly* or *Iqbal* changed the other pleading standards for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and the requirements of Fed. R. Civ. P. 8 must still be met. *See Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (internal citations omitted). Fed. R. Civ. P. 8 requires a showing, rather than a blanket assertion, of entitlement to relief, and "contemplates the statement of circumstances, occurrences, and events in support of the claim presented and does not authorize a pleader's bare averment that he wants relief and is entitled to it." *Twombly*, 550 U.S. at 555 n.3 (internal citations and quotations omitted). Additionally, the United States Supreme Court did not abolish the Fed. R. Civ. P. 12(b)(6) requirement that "the facts must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on those merits." *Phillips,* 515 F.3d at 231(*citing Twombly*, 550 U.S. at 553).

Generally, "to the extent that [a] court considers evidence beyond the complaint in deciding a 12(b)(6) motion, it is converted to a motion for summary judgment." *Anjelino v. New York Times Co.,* 200 F.3d 73, 88 (3d Cir. 1999). However, in resolving a 12(b)(6) motion to dismiss, a court may look beyond the complaint to matters of public record, including court files and records, and documents referenced in the complaint or are essential to a plaintiff's claim which are attached to a defendant's motion. *Pension Benefit Guar. Corp. v. White Consol.*

7

*Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Under this standard, the Loan Documents entered into between Plaintiffs and Huntington and which Defendant attached to its Brief in Support of Motion to Dismiss, may be considered by the court without converting the motion to dismiss into a motion for summary judgment. *See Pension Ben. Guar. Corp.*, 998 F.2d at 1196-97.

**Discussion**

A.  <u>Counts I and II - Claims Brought by West Run</u>

In Count I of the Amended Complaint, West Run alleges that Huntington breached its implied duty of good faith and fair dealing by providing certain confidential information to the developers of Copper Beech, which had been supplied to Sky Bank by CBRE / Melody. Amended Complaint, at ¶ 97. Huntington argues that Plaintiffs have failed to state a claim because, *inter alia*, no facts are alleged to support the conclusion that Huntington provided any information regarding the West Run project to the developers of Copper Beech. The Court agrees.

The problem with Count I is that it does not state sufficient facts to demonstrate that Huntington provided any information, much less proprietary information, to the developers of Copper Beech. Other than the bald assertion that Huntington revealed "to the Copper Beech developers some or all of the confidential, proprietary information assembled by West Run to solicit financing proposals for [the West Run project]," Plaintiffs have provided virtually nothing in the way of factual allegations to support this assertion. In the wake of *Twombly*, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level" and the complaining party must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The Court is "not

compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal quotations and citations omitted.) In the absence of anything more than unsupported conclusions and unwarranted inferences, Count I of the Amended Complaint will be dismissed in its entirety.

In Count II of the Amended Complaint, West Run alleges that Huntington breached the implied duty of good faith and fair dealing by allegedly participating in a loan to Copper Beech for a housing development near the West Run project. Plaintiffs also allege that Huntington's participation in such a loan was a breach of contract. Huntington argues that Plaintiffs have failed to state a claim because Plaintiffs have (i) failed to establish that the alleged financing of Copper Beech was a breach of the duty of good faith and fair dealing and (ii) failed to point to any contract or contractual provision whereby Huntington agreed not to extend financing to any other party. Plaintiffs respond that Huntington breached its duty of good faith and fair dealing because "West Run expected that Huntington would not take any action . . . that was blatantly *un*faithful to the agreed common purpose of developing a successful off-campus student housing project." Br. in Opp'n at 5-6.

The parties agree that the lending agreement contains no restrictive language which would prevent Huntington from making loans to any other person or entity. However, the position Plaintiffs advance appears to impose upon Huntington the obligation or duty not to lend to any person or entity that West Run considers a competitor, notwithstanding the fact that the loan agreement contains no such restriction. This argument borders on the frivolous. Accordingly, Count II of the Amended Complaint will be dismissed in its entirety.

B.     <u>Count III - Claims Brought by Mt. Tabor Village</u>

Mt. Tabor Village alleges in Count III of the Amended Complaint that Huntington breached its obligations under the relevant loan document when it failed to make required construction advances. In the Amended Complaint, Plaintiffs allege that "[a]t the time that Huntington withheld this construction advance, Mt. Tabor Village, LLC was completely in compliance with all of its obligations under the loan documents." Amended Compl. at ¶ 109. However, the factual allegations contained in Plaintiff's original Verified Complaint suggest otherwise.

The Construction Loan Agreement between Mt. Tabor Village and Huntington explicitly conditions Huntington's obligation to fund construction advances upon Mt. Tabor Village achieving a certain level of "pre-sold" condominium units. Ex. 4 at 15. Specifically, the Construction Loan Agreement provides as follows:

> C.     Borrower's Pre-Sale Requirement. Bank's obligation to make Advances is hereby made expressly conditioned and contingent upon Borrower providing to Bank evidence, satisfactory to Bank, in Bank's sole discretion, that Borrower has entered into and there are currently in place Qualified Sale Agreements for twenty-nine (29) Units (hereinafter referred to as "Borrower's Pre-Sale Requirement").

Construction Loan Agreement, Ex. 4 at 15. Plaintiff's original Verified Complaint states that at the time of closing, Mt. Tabor Village had achieved presales with nonrefundable deposits "pending" for 27 out of 38 of the units in the project. Complaint at ¶ 45. That number (27) was later reduced to 12. *Id*. at ¶ 69. Huntington moved to dismiss the original Verified Complaint on the basis that from Plaintiff's own admissions regarding its pre-sales deficiencies Plaintiffs could not assert a breach of contract claim against Huntington for failing to make such an advance.

Apprised of this significant shortcoming, Plaintiffs filed an Amended Complaint which completely omitted any assertion about the Construction Loan Agreement's pre-sale requirement.

Plaintiffs argue that Count III should not be dismissed on two grounds: (i) "an incorrect number of presales [] was inadvertently cited by Plaintiffs in their original Complaint;" and (ii) an amended complaint supersedes the original complaint and "[o]nce an amended pleading is interposed, the original pleading no longer performs any function in the case . . . ." Pl's Br. at 10.

Plaintiffs first argue that they misstated the number of pre-sales in the original Complaint. However, rather than amending the record by setting forth the correct number of pre-sales in their Amended Complaint, Plaintiffs chose to delete the pre-sales reference altogether.

As to Plaintiffs' second argument, it is true that generally an amended complaint supersedes the original complaint. However, a plaintiff is not permitted to take a contrary position to an allegation contained in a complaint in order to avoid dismissal. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008) ("Although [Plaintiff's] attempt to salvage its [ ] claim now requires it to take a contrary position, the allegation in the amended complaint is a binding judicial admission."; *see also Parilla v. IAP Worldwide Serv., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) (collecting cases). A plaintiff can "plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995). Allegations in a complaint are binding admissions; a party is bound by the admissions made in his original complaint and cannot simply erase these details by omitting them from his amended complaint. *See, e.g., Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998), abrogated on other

grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *In re LG Phillips Displays USA, Inc.,* 395 B.R. 864, 869 (D. Del. Bankr. 2008); *In re FleetBoston Fin. Corp. Sec. Litig.,* 2007 WL 4225832, at *29 (D.N.J. Nov. 28, 2007); *In re Enron Corp.,* 370 B.R. 583, 597-98 (S.D.N.Y. Bankr. 2007).

The Court finds that Plaintiffs have fallen victim to the well-settled rule that a party is bound by what it states in its pleadings. The original Complaint, verified by Russell P. Mills, one of the sponsors of West Run LLC and the Manager of West Run Housing, LLC, specifically states Plaintiffs did not meet the pre-sale requirement. Accordingly, the Court finds and rules that Huntington was thereby legally excused from any further funding obligations and Count III will be dismissed as a matter of law.

### C. Count IV - Claims Brought by Campus View

Similar to the Mt. Tabor Village Construction Loan Contract, the Campus View Construction Loan Contract also contained a pre-sales condition precedent:

> Phase II Pre-Sale Requirement. Bank's obligation to make Advances for Phase II is hereby made expressly conditioned and contingent upon Borrower providing to Bank evidence, satisfactory to Bank, in Bank's sole discretion, that Borrower has entered and there are currently in place Qualified Sale Agreements for fifty-four (54) Units in Phase I and Phase II (shall include any Units sold pursuant to a Qualified Sale Agreement) (hereinafter referred to as "Borrower's Phase II Pre-Sale Requirement").

Plaintiffs' Verified Complaint states that upon completion of Phase I, Campus View had presold 36 units. This number is far short of the 54 required under the Construction Loan Agreement for further funding under Phase II.

Accordingly, for the same reasons that Count III will be dismissed, Count IV will be dismissed as a matter of law.

D.  Leave to Amend

If a civil rights complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile. *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir. 2004). A district court must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend. In non-civil rights cases, however, a plaintiff must seek leave to amend and submit a draft amended complaint. *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d. 247, 252-53 (3d Cir. 2007). Plaintiffs have not sought leave to amend in this case and it appears to the Court that such an effort would be futile.

**Conclusion**

After viewing the facts in the light most favorable to Plaintiffs, the Court concludes that Defendant's Motion to Dismiss must be granted and Plaintiffs' Complaint dismissed with prejudice in its entirety.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WEST RUN STUDENT HOUSING ASSOCIATES, LLC; CAMPUS VIEW JMU, LLC; and MT. TABOR VILLAGE, LLC, | ) ) ) ) | |
| Plaintiffs, | ) | 2: 12-cv-00076 |
| v. | ) ) | |
| HUNTINGTON NATIONAL BANK, | ) ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 15th day of May, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the MOTION TO DISMISS filed by Huntington National Bank is **GRANTED** and Plaintiffs' Complaint is dismissed with prejudice in its entirety. The Clerk of Court is **DIRECTED** to docket this case closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Robert O. Lampl, Esquire
Email: rol@lampllaw.com

Peter S. Russ, Esquire
Buchanan Ingersoll & Rooney
Email: peter.russ@bipc.com

Kathleen J. Goldman, Esquire
Buchanan Ingersoll & Rooney PC
Email: kathleen.goldman@bipc.com

Renee M. Schwerdt, Esquire
Buchanan Ingersoll & Rooney
Email: renee.schwerdt@bipc.com